NAHAY *v.* ARKANSAS IRRIGATION COMPANY.

4-7066                                             190 S. W. 2d 965

Opinion delivered November 5, 1945.

Rehearing denied January 7, 1946.

248

*Coleman, Mann, McCulloch & Goodwin,* for appellant.

*A. G. Meehan, John W. Moncrief, J. D. Thweatt* and *Owens, Ehrman & McHaney,* for appellee.

*Henry M. Armistead, Jr., amicus curiae.*

GRIFFIN SMITH, Chief Justice. Because lands designated in the complaint would be overflowed by a dam it had constructed across Bayou La Grue, Arkansas Irrigation Company sought to condemn. Separate suits were consolidated when answers and cross complaints were filed. Prairie County Irrigation Company intervened, asserting it had previously acquired easements in respect of the property involved.

The Chancellor found (a) that Arkansas Irrigation Company, a corporation, had power of eminent domain; (b) under the Company's prospectus waters would be impounded in the bayou to a maximum depth of 207 feet above sea level;[1] (c) the claimed rights of Prairie County Irrigation Company were subordinate to those of the petitioner, having been subsequently asserted; (d) maps had been filed according to law showing the proposed improvement, and (e) damages should be awarded according to the several judgments rendered.

---

[1] In *Smith* v. *Arkansas Irrigation Co.,* 200 Ark. 1022, 142 S. W. 509, condemnation appears to have been predicated upon a maximum elevation of 205 feet above sea level. In the present appeal there are references to an elevation of 207 feet. We do not, in this opinion, adjudicate any controversy respecting this difference, if in fact the elevation has been raised.

Appellants state the issues to be: (1) Legal authority to construct the dam was lacking. (2) Act 87 of 1909 does not confer the rights claimed by appellee; but, (a) if the right exists, appellee has not brought itself within the legislative requirement. (3) The case of *Smith* v. *Arkansas Irrigation Company*, 200 Ark. 1022, 142 S. W. 2d 509, has no application. (4) There was a prior dedication of the lands to public use. (5) Appellee has not complied with the provisions of Act 324 of 1935, and therefore it cannot exercise any of the powers granted to a public utility.

Attention is directed to §§ 4944-4970 of Pope's Digest, brought forward from Chapter 98 of the Revised Statutes, the Act having been approved February 20, 1838. Insistence is that the measure deals exclusively with the construction of dams across non-navigable watercourses. Under this Act proceedings must be filed in Circuit Court, stating that the petitioner is the owner in fee simple of land on which the dam is to be constructed. Another section governs where the petitioner owns land on one side of the watercourse and a part of the bed "at the point where he proposes to erect a dam." In either case the proceeding is similar, and was not followed by appellee in the litigation at bar.

This Act, it is insisted, does not grant the right to build mills or other agencies for utilization of the water. Its sole purpose, say appellants, is to prescribe an exclusive method by which dams may be constructed across non-navigable waters, and failure to follow the prescribed procedure is fatal. The primary reference to mills, say appellants, is in connection with venue, and has nothing to do with substantive rights.

We think the Act is somewhat broader. Its language clearly shows that the lawmaking body thought of dams as a means for providing mill power. In the fourth section where venue is treated the introductory words are, "If a mill or other dam be proposed." By § 5 the petitioner is not only required to describe the land, show *prima facie* title, and state the dam's height; but he

must also [set forth] "the kind of mill and other machinery which he proposes to connect with the dam." If, as in the Act's second section, the petitioner does not own land on both sides of the watercourse, he must [set forth] "on what side he proposes to erect his mill or other machinery." Other sections speak of "the dam and mill," using the words interchangeably. .

We are asked to adopt appellants' viewpoint: that is, "The statute covers the whole field of the construction of dams across non-navigable streams, except dams for certain specific purposes, such as hydroelectric plants. . . . It is the legislative declaration that the construction of dams across non-navigable streams involves the public health, and that no such dam shall be constructed until a judicial investigation of its possible effect on the health of the neighborhood is conducted by the Circuit Court and an express finding is made that the dam will not endanger the public health by stagnant waters."

When the Act in its entirety is read, and when it is considered in the light of conditions prevailing in 1838, as emphasized by repeated references to "the mill," "the machinery," "his mill," and words of like import, there is the compelling thought that mill dams were the primary subjects of legislative concern.

It is contended that appellee has not brought itself within Act 324 of 1935.[2] The term "public utility" is there defined. It includes persons, corporations, etc., engaged (1) in producing, generating, transmitting, delivering, or furnishing gas, electricity, steam or other agency for the production of light, heat or power to, or for, the public for compensation; (2) diverting, developing, pumping, impounding, distributing, or furnishing water to, or for, the public for compensation. In order to exercise the rights covered by Act 324, the agency proposing to so function must procure from the Department of

---

[2] This is an Act "providing for the better regulation of certain public utilities in the State of Arkansas and for other purposes."

Public Utilities[3] a certificate of convenience and necessity.

The cause from which this appeal comes was transferred from Circuit to Chancery Court on petition of appellants, a contention being that Prairie County Irrigation Company, as intervener, should have its prior rights declared in equity. If successful this would have denied Arkansas Irrigation Company the power to condemn the additional lands it now claims are necessary to the project. But other than the claimed priority the intervener, in its original pleadings, asserted no higher legal right to construct a dam and overflow privately-owned lands than was shown by appellee. The allegation was that Prairie County Irrigation Company is a corporation organized pursuant to the provisions of Act No. 87 of 1909 ". . . [and that it] has formulated plans for the construction of a reservoir to impound water for irrigation purposes." It was then stated that [evidence of the procurement of easements described in the complaint] was duly filed in the office of the Recorder for the Southern District of Prairie County. Thus, says the intervention, by such conduct it acquired in good faith a paramount easement in the land for use as a reservoir, such rights being referable to Act 87.

It is now contended that whatever rights may have accrued through the processes adopted by appellee, power to condemn was lacking because a certificate of convenience and necessity was not procured under the provisions of Act 324.

*Smith* v. *Arkansas Irrigation Company,* 200 Ark. 1022, 142 S. W. 2d 509, presented the question whether land sought to be condemned (as to which there had been judgment for the Irrigation Company) was taken for a public purpose. Our holding was that in view of the provisions of Act 87, and "because of the peculiar situation of rice farmers and their entire dependence upon water," the taking was for a public purpose, and the easement

[3] The Department of Public Utilities and the Arkansas Corporation Commission were consolidated by Act 40—approved February 12, 1945. The new agency is Arkansas Public Service Commission.

was properly acquired. Act 324 was not pleaded in the Smith case; nor were its requirements originally assigned in the current litigation as grounds for holding that the condemnation proceedings were illegal.

Section 41 of Act 324, in part is: "No new construction or operation of any equipment or facilities for supplying a public service, or extension thereof, shall be undertaken without first obtaining from the [Department of Public Utilities] a certificate that public convenience and necessity require, or will require, such construction or operation." Section 42 is an interdiction against the act of a public utility in exercising any rights or privileges "under any franchise or permit hereafter granted."

If it be conceded that before new construction can take place, or before any equipment or facilities may be used in supplying a public service, it is mandatory that the certificate in question be procured, answer is that condemnation is a constitutional concession, to be exercised under appropriate legislative sanction and is distinct from rate-making. In respect of operation, § 43 (a) of Act 324 provides that before a certificate may be procured, certain requirements shall be complied with, including evidence satisfactory to the [Department of Public Utilities] that the applicant has received the consent, franchise, permit, ordinance, vote, or other authority of the proper municipality, "or other public authority if required."

Section 42 of Act 324 deals with franchise and permits. Clearly the 1909 enactment intended to give irrigation companies the power to condemn lands—a right that will be sustained by courts when the showing is that the legislative purpose was being served. In the case before us there is no municipality to which the applicants could apply for a franchise or permit, and there is no express provision designating another public authority. It must be held, therefore, that even though the present Public Service Commission might have the power to regulate rates and require equitable distribution of water, etc., (a matter we do not decide) failure to procure a certificate

of convenience and necessity was not fatal to the organization; nor did it avoid the rights adjudicated in its favor.

The Chancellor held against appellants' argument that appellee's intentions were merely colorable and that there was no sincere purpose to use the dam for public irrigation purposes. Testimony of C. B. Bailey, engineer for those who sought to halt the work, is to the effect that when he went on the premises to survey for Prairie County Irrigation Company, Arkansas Irrigation was already on the ground with laborers and equipment. There was an effort to show that the reservoir was intended to attract wild ducks, and that it was in the nature of a private game preserve. This was not substantiated. On the whole we think the Chancellor correctly decided the controlling issues.

Affirmed.